**RAILROAD COMMISSION OF TEXAS et al. v. SOUTHWESTERN GREYHOUND LINES, Inc.**

No. 8445.

Court of Civil Appeals of Texas. Austin.

Feb. 26, 1936.

Rehearing Denied March 18, 1936.

J. E. Quaid and R. B. Rawlins, both of El Paso, for appellant Jackson.

Price & Christopher and Wm. E. Dahl, all of Fort Worth, for appellee.

BAUGH, Justice:

On February 19, 1935, Edward A. Jackson filed with the Railroad Commission his application, under the Texas Motor Carrier Act (Acts 1927, c. 270, p. 399, as amended, Vernon's Ann.Civ.St. art. 911a), for a certificate of convenience and necessity to operate a motorbus service wholly interstate, from the New Mexico line over Texas highways, via El Paso, Abilene, and Fort Worth to Dallas, Tex. After two hearings thereon, such certificate was granted by the commission on September 27, 1935. Thereupon, the appellee, an interested party and competitor, appealed from such order by filing suit in the district court of Travis county, to set it aside

and for injunction to restrain Jackson from operating under such certificate, and to restrain the commission from permitting him to do so. This temporary injunction was by the trial court granted as prayed for on October 5, 1935, from which order this appeal is prosecuted. The Railroad Commission has not filed any brief. Jackson and the Greyhound Lines have.

A rather anomalous situation is presented by contentions here made by appellant Jackson and appellee. Both contend that the Federal Motor Carrier Act, 1935 (49 U.S.C.A. § 301 et seq.), signed by the President on August 9, 1935, which did not become operative under its terms until October 1, 1935, wherein the regulation of interstate motor transportation for hire was vested in the Interstate Commerce Commission, completely superseded and nullified all authority of the states over such transportation, and deprived the Railroad Commission of Texas of any jurisdiction over Jackson's application; and that therefore the order of the commission was void for want of jurisdiction. At this point, however, the views of appellant and appellee diverge. Jackson contends that because the federal government had assumed control of such interstate commerce, state authority over it was entirely excluded; that as a result the order of the Railroad Commission was void for want of jurisdiction; that for the same reason the state court was without jurisdiction in this suit; and that only the federal courts had jurisdiction over such subject-matter. The Greyhound Lines, on the other hand, contend that the order being void for want of jurisdiction of the Railroad Commission to make it, the state court had concurrent jurisdiction with the federal courts to enjoin its enforcement.

While the grounds upon which the injunction was granted are not stated in the injunction, it is to be noted that the trial court enjoined the interstate operations of Jackson, and enjoined the commission from permitting him to operate at all, not from regulating his operation otherwise. If, as contended by both parties, the Federal Motor Carrier Act completely occupied the field of regulation of such interstate commerce, to the entire exclusion of the state, in view of the fact that said act provides for its enforcement through the federal District Courts (section 222(b), 49 U.S.C.A. § 322(b), and that such act

relates only to interstate commerce, we think that the federal courts would have exclusive jurisdiction over any suit to enforce the act. Gulf, C. & S. F. R. Co. v. Moore, 98 Tex. 302, 83 S.W. 362, 4 Ann. Cas. 770; Pennsylvania R. Co. v. Puritan Coal Mining Co., 237 U.S. 121, 35 S. Ct. 484, 59 L.Ed. 867; 15 C.J. 1153, § 633. And if the Railroad Commission had no jurisdiction to enter its order at the time it did, the only jurisdiction the state court could exercise would be to adjudge the order of the commission void for that reason. It could not, as it undertook to do, enjoin the interstate operation of Jackson, if, as contended, the control over that operation had been transferred by the federal act exclusively to the Interstate Commerce Commission. The federal District Court would be the proper forum for that purpose.

We are, however, confronted at the outset with the question, first, whether the Railroad Commission had any jurisdiction over Jackson's application for a certificate of convenience and necessity to operate interstate at the time he sought such certificate; and, second, if so, whether the Federal Motor Carrier Act, 1935, completely deprived the Railroad Commission of such jurisdiction as it theretofore had.

Because of the inconsistent and sometimes conflicting holdings of state courts and of federal courts, both trial and appellate, on this subject, considerable confusion has arisen. At the outset, and before the expansion of interstate commerce by motor transportation over the public highways to its present proportions, the courts manifested a disposition to follow the rules applied to the regulation of interstate commerce over the railroads. It is not amiss to here observe, however, that there are fundamental underlying differences, inherent in nature, which have come to be recognized by the courts, both in character and the rights of the carrier, between interstate transportation by rail, and such transportation over the public highways. In the one instance the carrier builds, owns, equips, maintains, and operates its own right of way at its own expense. Such right of way is private and not public property, subject to taxation, and taxed as such. The carrier's right to transport property over and upon such roadbed cannot be denied. It can, subject to proper limitations prescribed by law, and not necessary to consider here,

deny to others and to the public the right to the use of such property and to protect it against trespassers. While the business conducted thereon is affected with a public interest, subject to the police power of the state and of the federal government, and to reasonable regulation as such, it still retains its character as a private undertaking, subject to regulation by law in the public interest.

On the other hand, in the field of motor carrier operation over the highways, the roadbed used is one owned, built, and maintained by the state from taxes exacted from its citizens. It was not constructed for the purpose of enabling individuals or corporations to conduct a business thereon for hire, either interstate or intrastate, for their own profit, but for the use and benefit of the public. No individual or corporation has any such interest in, or rights thereon, as entitle him to conduct a business for hire over such roads. Such use of the highways for such purpose is therefore only permissive, subject to regulation when granted, and may be denied or withdrawn, whenever it becomes destructive of the state's property, or dangerous to the safety of the public in its use of the highways in the manner and for the purposes for which such highways were constructed and are maintained by the state.

Under these facts and circumstances, and the inherent differences of the subject-matter of regulation, there should be, and as we interpret the recent decisions of the Supreme Court of the United States, there has been, a clear differentiation between the authority of the state to regulate the use of its highways, even though such regulation interferes with interstate commerce carried over same, and the right of the state to interfere with such commerce carried over the railroads. The old rate cases, and other decisions of the United States Supreme Court bearing upon state legislation and regulations affecting interstate commerce over the railroads are not, therefore, applicable to all phases of such commerce carried, by permission only, and not as a matter of right, over the state highways, which are the property of the state and not the property of the carriers. The necessity for such differentiation is, we think, manifest.

Appellant Jackson cites, as conclusive of his contention that the Railroad Commission was wholly without jurisdiction over

his application for a certificate, the case of Anderson, Clayton & Co. v. State, 122 Tex. 530, 62 S.W.(2d) 107, 111, and the cases therein cited in support of the pronouncement there made on this question. We pass without consideration here, as we do not deem it necessary, the question of whether Jackson is entitled to attack the jurisdiction of the state agency to pass upon his application whose jurisdiction he had himself voluntarily invoked for that purpose. The legislative act considered in the Anderson, Clayton & Company Case was that dealing with carriers of property over the highways, whether as common carriers or contract carriers, in brief, motortruck regulation. Vernon's Ann.Civ.St. art. 911b. Here there is involved the regulation of carriers of passengers, or motorbus regulation. Article 911a, Vernon's Ann.Civ.St. But so far as the power of the state and of the federal government to regulate the operations over such highways with reference to interstate commerce is concerned, the same principles would manifestly apply to the regulation of both motorbus and motortruck operations thereon.

In the Anderson, Clayton & Company Case, supra, with reference to the Texas law, the court says: "That part of the act which requires vehicles engaged wholly in interstate commerce to obtain a certificate of public convenience and necessity is void." We have examined the briefs submitted by the parties in connection with the questions certified to the Supreme Court in that case. We do not understand from them that the validity of the Texas motor carrier law as applied to interstate commerce was there attacked. The contention made in that case was that the operations of Anderson, Clayton & Co. therein described did not constitute carriage for hire over the highways so as to bring them within the terms of the state law, and not that the state law as to such operation, if within its provisions, was void. This question was not answered by the Supreme Court. It might be, therefore, that such holding was not essential to the disposition of that case, but we take it as the expression of the opinion of the Supreme Court on that question.

The Railroad Commission is the delegated agency of the state to regulate, under the law, commerce over the state's highways. It has no authority to do so other than that given it by the statutes.

These statutes make no distinction between interstate and intrastate commerce over such highways. If, therefore, the act is void in toto so far as it affects interstate commerce, the Railroad Commission has no jurisdiction whatever over that character of commerce over the highways. But we do not so construe the state law nor the holding of the Supreme Court above quoted. The confusion seems to have arisen because of the failure of the courts to make proper distinction between the power of the Railroad Commission to determine the question of the convenience and need for carrying on interstate commerce over the highways as a needed commerce, on the one hand, and the question of whether the public safety and the preservation of the roads themselves will permit, on the other hand, any added burden of commerce thereon, either intrastate or interstate. As we understand and interpret the decisions of the Supreme Court of the United States, and that in the Anderson, Clayton & Company Case, and the cases cited therein, there is denied to the Railroad Commission the power and jurisdiction to determine whether there exists a public need and a public convenience for such interstate commerce, as commerce (that being strictly a function to be performed by the federal government under the interstate commerce clause of the Constitution); but that there is not denied to the state, through its Railroad Commission, the right to determine whether the safety of the traveling public and the preservation of its own property in its highways will permit any additional burdens of commerce upon and over such highways, irrespective of whether such burdens result from interstate or intrastate commerce thereon.

This distinction is, we think, clearly recognized in Galveston Truck Line Corporation v. Allen (D.C.) 2 F.Supp. 488, 489, affirmed by U. S. Supreme Court in 289 U. S. 708, 53 S.Ct. 694, 77 L.Ed. 1463, in the following language: "Since, therefore, the refusal by the commission to issue a permit is based, not upon considerations of traffic safety, or of the protection of the highways from injury to them, or from congestion thereof, but only of the commerce itself and the business of those who transport it, that is, of whether there is already adequate provision for handling such commerce and the effect upon those engaged in it which the granting of the

permit will have, the ruling necessarily operates as a burden on interstate commerce and may not stand."

In Buck v. Kuykendall, 267 U.S. 307, 313, 45 S.Ct. 324, 326, 69 L.Ed. 623, 38 A.L.R. 286, the Supreme Court, Justice Brandeis writing, wherein the director of public works of the state of Washington refused an application for a permit of public convenience and necessity to operate over the highways of the state interstate to Portland, Or., struck down the state law on the ground that "Its primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition." But the Supreme Court, the same Justice writing, eight years later in the case of Bradley v. Public Utilities Com., 289 U.S. 92, 93, 53 S.Ct. 577, 578, 77 L.Ed. 1053, 85 A.L.R. 1131, wherein the Public Utilities Commission of the state of Ohio had refused Bradley a permit to operate over a state highway interstate to Flint, Mich., on the ground that the "proposed service would create and maintain an excessive and undue hazard to the safety and security of the travelling public, and the property upon such highway," upheld the power of the state to do so, and held: "The state may exclude from the public highways vehicles engaged exclusively in interstate commerce, if of a size deemed dangerous to the public safety, Morris v. Duby, 274 U.S. 135, 144, 47 S.Ct. 548, 71 L.Ed. 966 [971]; Sproles v. Binford, 286 U.S. 374, 389, 390, 52 S.Ct. 581, 76 L.Ed. 1167, 1179, 1180. Safety may require that no additional vehicle be admitted to the highway. The Commerce Clause is not violated by denial of the certificate to the appellant, if upon adequate evidence denial is deemed necessary to promote the public safety. Compare Hammond v. Schappi Bus Line, 275 U.S. 164, 170, 171, 48 S.Ct. 66, 72 L.Ed. 218 [220, 221]."

To the same effect is the holding of the Supreme Court, Chief Justice Hughes writing, in Continental Baking Co. v. Woodring, 286 U.S. 352, 52 S.Ct. 595, 76 L.Ed. 1155, 81 A.L.R. 1402, in construing the motor carrier laws of the state of Kansas.

In Sproles v. Binford, 286 U.S. 374, 52 S.Ct. 581, 585, 76 L.Ed. 1167, involving the Texas law, Chief Justice Hughes writing, quotes with approval the holding of that court in Morris v. Duby, 274 U.S. 135, 143, 47 S.Ct. 548, 71 L.Ed. 966, 971, as follows: "An examination of the acts of Congress discloses no provision, express or implied, by which there is withheld from the state its ordinary police power to conserve the highways in the interest of the public and to prescribe such reasonable regulations for their use as may be wise to prevent injury and damage to them. In the absence of national legislation especially covering the subject of interstate commerce, the state may rightly prescribe uniform regulations adapted to promote safety upon its highways and the conservation of their use, applicable alike to vehicles moving in interstate commerce and those of its own citizens. In the instant case, there is no discrimination against interstate commerce and the regulations adopted by the state, assuming them to be otherwise valid, fall within the established principle that in matters admitting of diversity of treatment, according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act."

From these and other cases that might be cited, it is clear, we think, that prior to the passage of the Federal Motor Carrier Act, 1935, the state had the undoubted right to regulate or even to forbid additional commerce over its highways, whether intrastate or interstate, if the preservation of its own property in the highways or the safety of the traveling public demanded it, so long as no discriminations were made. That being true, the question arises as to how this power of the state may be exercised, and as to what grounds are encompassed in the action of the Railroad Commission in granting or refusing a "certificate of public convenience and necessity." As above indicated, the Railroad Commission is without power to determine the need or convenience for interstate commerce. This is manifest for the reason that the need and convenience of the people of other states than Texas is involved in the determination of this question, a matter over which the Railroad Commission has no jurisdiction. But an examination of the state law discloses that these are not the only questions which the Railroad Commission must determine in granting or refusing such certificate. The term "certificate of public convenience and necessity" should not, we think, be given such a restricted meaning. It is but a license or permit, granting a privilege

to the applicant to use the highways for the purposes proposed. It is but evidence of the state's permission to the applicant to so use its highways. As a prerequisite to the granting of such permission, the statutes impose upon the commission the duty to determine not only (Vernon's Ann. Civ.St. art. 911a, § 6, and article 911b, § 8) "the demand for, or need of additional service, if there exists a public necessity for such service," but to determine also, even if such public need and convenience exist (Vernon's Ann. Civ.St. art. 911a, § 7, and article 911b, § 9), whether the highways over which commerce is sought to be carried, "are of such type of construction or in such state of repair, or subject to such use as to permit of the use sought to be made by the applicant." And if the commission find that "such highway or highways are not in such state of repair, or are already subject to such use as would not permit of the use sought to be made by the applicant without unreasonable interference with the use of such highway or highways by the general public for highway purposes, then in either or any such event such application may be denied and said certificate refused."

It appears, therefore, that the duty is imposed upon the commission, before acting upon an application, to determine three questions: First, whether such commerce is needed to serve the public convenience; second, whether the structure and preservation of the highways will permit such use; and, third, whether, admitting both of these, the safety of the public will authorize such use. As to the first of these questions, the Railroad Commission has jurisdiction only as to intrastate commerce, and not as to interstate commerce. As to the second and third questions, under the decisions above cited, the Railroad Commission has jurisdiction both as to interstate and intrastate operations so far as they affect the highways within the state. The only method provided by the statute for the commission to deny the use of such highways to those seeking to use them for profit in interstate commerce, where road protection and public safety forbid such use, is by refusal to grant such applicant a "certificate of public convenience and necessity" to do so. We conclude, therefore, that in so far as road preservation and public safety are concerned, the commission did have authority and jurisdiction to grant or refuse such application for a certificate, even though interstate commerce be involved. But that as to the need or convenience for such interstate service, the commission was wholly without authority to determine that. In the light of the holdings in the cases cited by the Supreme Court in the Anderson, Clayton & Company Case, supra, and those above quoted from, we interpret the language used in the Anderson, Clayton & Company Case to mean · that and nothing more.

The next question presented is whether the Federal Motor Carrier Act, 1935, completely occupied the field of interstate commerce by motor carriers over the highways, to the entire exclusion of all state regulation or control thereof.

While the operation of said act was postponed until October 1, 1935, and the commission's order was entered September 27, 1935, the act was signed by the President on August 9, 1935. It now seems settled that when Congress assumes control over a field of legislation in which it has power to act, such control is paramount and exclusive; and the assumption of such control dates from the date of the approval of such legislative act, and not from the date such act may become operative in futuro. Northern Pac. R. Co. v. State of Washington, 222 U.S. 370, 32 S.Ct. 160, 56 L.Ed. 237; Erie R. Co. v. State of New York, 233 U.S. 671, 34 S.Ct. 765, 58 L. Ed. 1149, 52 L.R.A.(N.S.) 266, Ann.Cas. 1915D, 138. That being true, the date of the invasion by the federal government of this field of regulation would be as of August 9, 1935, and the limitations of such act on the powers of the State Railroad Commission as to interstate commerce by motor carriers, were effective at the time the commission acted in the instant case.

Did the act in question then deprive the state of its right to prohibit to interstate motor carriers of commerce the use of its highways where such use would unduly injure its highways or unduly endanger the lives of the public in the use of same? We do not so construe it. We find nothing in the act of Congress which expressly or by necessary implication purports to do so. It is not necessary for us to consider the question of whether Congress has the power to deny to the state the right to protect and preserve its own property, or to protect the lives and prop-

erty of its citizens in the use of such highways. Where there is conflict between the acts of Congress acting within its sphere and state legislation upon the subject, the state laws must give way. Erie R. Co. v. State of New York, supra, and cases therein cited. But there should not be confused the matter of regulating such interstate commerce, granting the need and convenience of same, and the right of the state to preserve its highways and protect the public against dangers thereon, by prohibiting their use for additional commercial purposes to all such commerce whether interstate or intrastate. As to the former, that is, the matter of regulation, the right to carry on such commerce being conceded, the Federal Motor Carrier Act, 1935, undoubtedly supersedes all rights of the state in that regard. The provisions of said act cover all phases of the field of regulation, e. g., facilities of the operator, equipment, schedules, rates, routes, liability insurance, interchange of passengers and property between such carriers, hours of labor, driver's licenses, etc. Said act is too comprehensive to undertake to review it here. We have studied it carefully, however, and find no provisions in it relating to, nor vesting in the Interstate Commerce Commission the duty to pass upon, the matters of conserving the state highways or dangers to public in the use of such highways, matters which the Supreme Court of the United States had, prior to the passage of such act, held that the state had the right and authority to determine. These matters were recognized as being reserved to the state. It must be presumed that the Congress was familiar with these holdings of the Supreme Court when it enacted such Motor Carrier Act. That being true, the fact that the federal act does not undertake to invade this field, nor to interfere with this legitimate exercise by the states of their police power in this regard, strongly negatives any intention to do so, if as a matter of law it does not indeed amount to a refusal to interfere with the rights of the states with respect to these questions. We think the rule of construction announced by the Supreme Court in Illinois Central Railroad Co. v. Public Utilities Commission, 245 U. S. 493, 38 S.Ct. 170, 176, 62 L.Ed. 425, is particularly applicable here. In that case the court said: "In construing federal statutes enacted under the power conferred by the commerce clause of the Constitution the rule is that it should never be held that Congress intends to supersede or suspend the exercise of the reserved powers of a state, even where that may be done, unless, and except so far as, its purpose to do so is clearly manifested. Reid v. Colorado, 187 U.S. 137, 148, 23 S.Ct. 92, 47 L.Ed. 108 [114]; Cummings v. Chicago, 188 U.S. 410, 430, 23 S.Ct. 472, 47 L.Ed. 525 [531]; Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182; Missouri, K. & T. R. Co. v. Harris, 234 U.S. 412 [419], 34 S.Ct. 790, 58 L.Ed. 1377, 1382, L.R.A.1915E, 942. This being true of an act of Congress, it is obvious that an order of a subordinate agency, such as the Commission, should not be given precedence over a state rate statute otherwise valid, unless, and except so far as, it conforms to a high standard of certainty."

We conclude, therefore, that in the respects and to the extent above indicated the Railroad Commission of Texas did have jurisdiction to grant or refuse, as the conditions warranted, appellant's application to operate interstate over the highways of Texas; and that the Federal Motor Carrier Act, 1935, did not undertake, either expressly or by necessary implication, to deny to the state the power and authority to limit or even prohibit commerce on such highways, if such prohibition or denial be reasonably necessary to preserve its highways, or to protect the safety of the public in its use of such highways.

▆▆▆ The permit having been granted in the instant case it necessarily embodied a finding by the commission that the roads designated would bear the additional burden of such operation, and that the public safety would not be endangered by it. Among other grounds of attack upon the commission's order, as rendering it invalid, all of which grounds were denied under oath both by the commission and the appellant Jackson, was one that the commission did not hear evidence in the hearings before it of the condition of certain portions of the highways involved. The attorney for the Greyhound Lines testified that he was present at such hearings and that no such evidence was offered by Jackson as to a portion of highway 1-A between Cantey and Mineral Wells; nor as to highways 120 and 114 from Fort Worth via Grapevine to Dallas.

An order of the commission imports verity and a compliance with the law which authorizes it. The burden is upon those at-

tacking such order to show the contrary. The appellee offered no proof that either the structure of or the congestion of traffic upon the portions of the highways of which it complains were such that they would not permit the added burden caused by Jackson's proposed operation thereon. This operation was for almost the entire distance—from El Paso to Fort Worth— over one of the cardinal highways of the state. While the statute contemplates and requires the commission to ascertain facts as to the burdens the highways involved will bear, both as to physical condition and traffic congestion, we do not understand the law to require that every time such application is made to use a state highway as a carrier the commission must conduct extensive hearings, and require detailed proof as to such conditions. If, in hearings upon other applications to operate over the same highways, it has ascertained these facts in hearings before it, it is entitled to take into consideration such facts and conditions so officially ascertained by it, without the needless expense and effort of reascertaining the same facts over and over again before it can pass upon such application. A cardinal highway being here involved, and one over which appellee, and doubtless many other carriers had been granted permits to operate, we think it may be assumed that the commission had, as the law required it to do, sufficiently ascertained, and was in possession of, these facts and circumstances at the time it passed upon Jackson's application. See Railroad Commission v. McDonald (Tex.Civ.App.) 90 S.W.(2d) 581. The burden was therefore upon appellee to show that no additional burdens could safely be placed upon such highway, or that the commission was not in possession of these facts, before it was entitled to set such order aside.

 The only remaining question relates to the highways designated between Fort Worth and Dallas. Jackson's original application sought the use of highways No. 1 and No. 1–A all the way from El Paso to Dallas. His amended application asked for an alternative route between Fort Worth and Dallas over what he designated as "Northwest Highway No. 121 between Dallas and Ft. Worth." The order of the commission granted him a permit over highways 120 and 114 between Forth Worth and Dallas. It is appellee's contention that highway 121 does not run through Dallas, and that since Jackson did not apply for a route over 120 and 114 from Forth Worth to Dallas, the commission had no authority to grant such permit over these roads. We do not think there is any merit in this contention. His original application was to use highway No. 1 between these two cities and his amendment asked for an alternative route. Obviously, the commission concluded that highway No. 1 between Forth Worth and Dallas would not in the public interest bear such additional use. Clearly it was within the power of the commission in such event to permit the use of an alternative route between these termini. This the commission did. The map attached to Jackson's application shows the alternative route requested and the highways involved, that is, from Fort Worth to Dallas via Grapevine. While perhaps in error as to the designation of this route by numbers of the highways to be used, we think there was no question as to the identification of the route desired. Obviously no one was misled, and no doubt could have existed at the hearings before the commission as to the route and roads involved. Under these circumstances, we think the irregularity complained of by appellee, if such it was, is immaterial and harmless.

Under all these facts and circumstances, we conclude that the injunction was improvidently granted. The temporary injunction is therefore dissolved, and the cause remanded.

Injunction dissolved; cause remanded.

### On Motion for Rehearing.

We correct, as requested in motion for rehearing, the statement in our opinion relative to highway No. 1–A "between Cantey and Mineral Wells." Such statement should have been highway No. 1–A from Abilene to where it intersects highway No. 1 near Mineral Wells. This was but an erroneous statement as to the location of a part of the highway involved and in no way alters the conclusions reached. In all other respects the motion is overruled.